**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 1 2 2014 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------x

PEARLIE JOHNSON,       :

      :

             **Plaintiff,**       :

      :

-against-       :

      :

UNITED STATES OF AMERICA,       :

      :

             **Defendant.**       :

------------------------------------------------------x

**MEMORANDUM & ORDER**

11-cv-4730 (ENV)

**VITALIANO, D.J.,**

Petitioner Pearlie Johnson is before the Court, *pro se,* on his petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2255. For the reasons set forth below, the writ is denied and Johnson's petition is dismissed.

### Background

After a jury trial in 2008, Johnson was convicted of possessing ammunition and, on another occasion, a firearm, having previously been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Specifically, Johnson was convicted of possessing ammunition in connection with a shooting that occurred on Staten Island, on July 25, 2005, (Count One), and possessing a firearm and ammunition in connection with a second shooting, also on Staten Island, on December 4, 2005, (Count Two).[1]

Johnson was indicted on January 25, 2007. (*United States v. Johnson*, No. 07-

---

[1] Because Johnson was convicted, the Court recites the following facts in the light most favorable to the verdict. *See Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012).

cr-0057 ("2007 Dkt."), Dkt. No. 9.) He was initially represented by retained counsel, Manuel Ortega, Esq., and pleaded not guilty. (2007 Dkt. Nos. 5, 10.) On January 25, 2008—with trial set to commence ten days later, on February 4, 2008—Ortega was terminated as counsel and replaced by Criminal Justice Act counsel David Weiss, Esq. following a *Curcio* hearing. A relatively straight forward case, Weiss advised the Court that he would be ready on ten days' notice. (Tr. dated Feb. 4, 2008 at 2, 9.) That Weiss got to work quickly was soon evident. On January 27, he filed a motion to suppress certain of Johnson's statements to law enforcement officers as well as certain photographic evidence. His omnibus filing also included a motion to sever counts one and two for trial and a motion requesting additional discovery. (2007 Dkt. Nos. 24, 25, 27.) In the following days, he filed additional pretrial motions and opposed the government's motions. (*See, e.g.*, 2007 Dkt. Nos. 28, 32, 34, 36, 38, 41.)

In one of its motions, the government sought to introduce evidence that Johnson had committed an uncharged shooting on December 9, 2005, and that the firearm used in that shooting was the same one from which the ammunition used in the July 25, 2005 shooting had been fired. (2007 Dkt. No. 17.) The government argued that this evidence was admissible under Federal Rule of Evidence 404(b), because (1) it indicated that Johnson possessed the ammunition used in the July 25 shooting, and, thus, was probative of identity as to count one; and (2) it demonstrated that he had access to firearms generally, which was relevant to both counts. Johnson opposed on the ground that the proposed evidence would be unfairly prejudicial and of little probative value, because the fact that Johnson used

a particular gun on December 9 was not actually probative of his mere possession of it five months earlier in July. (*See* 2007 Dkt. No. 28.) On February 5, 2008, the Court ruled that the evidence of the December 9, 2005 shooting would be admissible under Rule 404(b) as to both counts of the indictment. (Tr. dated Feb. 5, 2008 at 37-39.) The Court noted that, to the extent that there was potential for prejudice to Johnson, the Court would give a limiting instruction to the jury and to restrict the government's ability to comment on the evidence. (*Id.* at 38).[2]

Jury selection proceeded on February 4. The trial commenced on February 6, and continued over four trial days. (2007 Dkt. Nos. 39, 48.) The government presented evidence that, on the afternoon of July 25, 2005, Johnson was driving a red Hummer, registered to his sister, with at least two passengers inside. After leaving a McDonald's drive-through, the Hummer cut off another car driven by Paul Jamrogiewicz. An altercation ensued, at the conclusion of which the driver of the Hummer fired three shots at Jamrogiewicz, one of which hit him in the back. When police arrived on the scene, they recovered three 9-milimeter shell casings and one bullet. Subsequently, the Hummer was found abandoned about four miles away, with a McDonald's soda cup and hamburger nearby.

At trial, Jamrogiewicz testified he and the driver of the Hummer had stared at one another and that he remembered the driver's "cold stare" and his eyes. (Tr.[3]

---

[2] The government also sought to introduce evidence of Johnson's constructive possession of a gun on December 31, 2005. The Court ruled that the prejudicial nature of this evidence outweighed its probative value and excluded it. (Tr. dated Feb. 5, 2008 at 40.)

[3] Unless otherwise noted, "Tr." will refer to the transcript of Johnson's criminal trial.

at 30.) However, he acknowledged that, following the incident, police showed him a photo array that included Johnson's photograph, but he did not recognize any of the individuals in the array as the driver of the Hummer. Nonetheless, on direct examination, Jamrogiewicz identified Johnson—by pointing to him in court—as the driver of the Hummer. (Tr. at 42.)

The government also presented evidence that, on December 4, 2005, Johnson shot Trai Kaufman in an elevator in an apartment building on Staten Island. Kaufman testified about the shooting at trial, as did Jovan Jenkins, a friend of Johnson's who had been with him that night, Kerry Constantino, an eyewitness, and a police officer to whom Johnson later confessed that he had shot Kaufman. (*See* Tr. 164.) Video surveillance footage of the apartment building lobby and elevator where the shooting took place was played for the jury. In the footage, Johnson was shown wearing a distinctive white and brown fur coat. It showed him exit an elevator in the lobby with four friends as Kaufman was about to enter an adjoining elevator, and then, just after Kaufman entered his elevator, it showed Johnson turning and shooting Kaufman three times.

In line with the Court's pretrial evidentiary ruling, the government also presented evidence that, on December 9, 2005, Johnson shot Byron Lee and Donald Bracey in the Stapleton neighborhood of Staten Island. (*See* Tr. 241-45.) Expert testimony demonstrated that the gun used in that shooting was the same one from which the bullets were fired in the July 25, 2005 shooting. (*See* Tr. 322.)

The jury convicted Johnson on both counts. This Court sentenced him to 80 months' imprisonment on count one and 120 months' imprisonment on count two,

with the sentences to be served consecutively, three years of supervised release on each count, to be served concurrently, and a $200 special assessment. (2007 Dkt. No. 63)

Represented by new counsel, Johnson appealed his conviction, seeking reversal on two grounds: this Court's denial of his motion to sever the two counts of the indictment; and this Court's decision to admit evidence of the December 9, 2005 shooting. The Second Circuit affirmed the judgment of conviction on February 11, 2010. See *United States v. Johnson*, 365 Fed. App'x 242 (2d Cir. 2010). He submitted a petition for a writ of certiorari to the Supreme Court of the United States, which was denied on June 14, 2010. *See Johnson v. United States*, 130 S. Ct. 3441 (2010). Johnson's § 2255 petition was filed on September 26, 2011.

Read liberally, the instant habeas petition raises the following claims: (1) Jamrogiewicz was improperly allowed to identify Johnson in court; (2) evidence that Johnson committed the uncharged December 9, 2005 shooting was improperly admitted at trial; (3) two of the prosecution's witnesses gave perjured testimony; (4) the federal prosecutor who led the case against Johnson engaged in "overzealous" prosecution; and (5) Johnson's trial attorney provided ineffective assistance. The government moves to dismiss the petition on the ground that it was filed beyond the limitations period set forth in 28 U.S.C. § 2255. Alternatively, if the petition is timely, the government argues that all of Johnson's claims lack merit and should be dismissed.[4]

---

[4] The government's original and lone response to Johnson's petition was to dismiss it as

5

<u>Standard of Review</u>

A person who has been convicted and is currently a federal prisoner may petition the sentencing court to correct, vacate, or set aside the sentence under 28 U.S.C. § 2255. The grounds for relief are very limited. The § 2255 court may only grant relief only if it concludes: "(1) 'that the sentence was imposed in violation of the Constitution or laws of the United States;' (2) 'that the court was without jurisdiction to impose such sentence;' (3) 'that the sentence was in excess of the 'maximum authorized by law;' or (4) that the sentence 'is otherwise subject to collateral attack.'" *Hill v. United States*, 368 U.S. 424, 426-27 (1962). Restated, collateral relief under § 2255 is available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill,* 368 U.S. at 428). Because Johnson is proceeding *pro se* at this stage, "his petition will be construed liberally and interpreted to raise the strongest arguments it suggests." *Paez v. U.S.*, Nos. 11-cv-2688, 08-cr-0823–03, 2012 WL 1574826, at *1 (S.D.N.Y. May 3, 2012) (citing *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)).

<u>Discussion</u>

I.    <u>Timeliness of the Petition</u>

Under 28 U.S.C. § 2255, Johnson was required to bring his writ application within one year of the later of the date on which the judgment of his conviction

---

untimely. At the Court's request, the government submitted additional briefing as to the merits of the petition.

became final, or the date on which the facts supporting his claims could have been discovered through the exercise of due diligence. 28 U.S.C. § 2255(f).[5] A conviction becomes final when the Supreme Court "affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." *Clay v. United States*, 537 U.S. 522, 527 (2003). The Supreme Court denied Johnson's petition for a writ of certiorari on June 14, 2010. Additionally, it is plain from his petition that Johnson knew of all of the facts supporting his claims as of the conclusion of his trial. As such, to be timely under § 2255, Johnson's petition had to have been filed by June 14, 2011.

The docket shows that this petition was filed on September 26, 2011—three months after the deadline.[6] However, the one-year limitation is not jurisdictional, and it may be equitably tolled if—and only if—"(1) the moving party requests the extension upon or after filing an actual section 2255 motion, and (2) 'rare and

---

[5] A petition can also be filed within one year of "the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;" or "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." 28 U.S.C. § 2255(f). Neither event is asserted or relevant here.

[6] Under the "prison mailbox rule," a petition is deemed to have been filed "at the time petitioner delivered it to the prison authorities for forwarding to the court clerk." *Houston v. Lack*, 487 U.S. 266, 276 (1988). The record does not reflect when Johnson delivered his petition to prison authorities for filing, and the petition itself is undated. The record is not, however, as silent as it might sound. Johnson indicates in his petition that he prepared and submitted it sometime after August 25, 2011, which was still more than two months after the filing deadline. (*See* Pet'n at 12.) Hence, the prison mailbox rule does not save the petition from being time-barred.

exceptional' circumstances warrant equitably tolling the limitations period." *Green v. United States*, 260 F.3d 78, 82-83 (2d Cir. 2001). "To qualify for such treatment, the petitioner must establish that extraordinary circumstances prevented him from filing his petition on time, and that he acted with reasonable diligence throughout the period he seeks to toll." *Belot v. Burge*, 490 F.3d 201, 205 (2d Cir. 2007) (quoting *Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004)).

In his petition, Johnson offers the following regarding his failure to file within the one-year period:

> I have written numerous letters to my attorney Lawrence Gerzog and the 2nd Circuit Court of Appeals requesting all my legal documents so I can complete my 2255 motion. My lawyer just now sent me my legal work on 8-25-11. I will ask him to send yall a memo stating that he ignored my letters requesting my legal materials. Also I wrote the [E]astern [D]istrict of New York court house explaining my situation. My attorney kept telling me I had to pay for copies and he was not going to pay. I explained that I couldn't afford to pay .... This went on for a very long period of time before he turned over my trial transcripts. I'm still trying to attain my Jencks material but I guess I have to work with what I got.

(Pet'n at 12.[7]) Reading the filing liberally, the Court understands this to be a request for an extension of time in which to file his § 2255 petition. Petitioner, essentially, argues that he was denied access to the materials from his trial that he needed to prepare his application, despite repeated requests to counsel and the

---

[7] In response to the government's motion to dismiss on the ground of untimeliness, Johnson clarifies that his attorney eventually provided him with half of his trial transcripts, his legal briefs, and his docket sheet. (*See Johnson v. United States*, No. 11-cv-4730 ("2011 Dkt."), Dkt. No. 5.)

courts, until after his petition was due. To be entitled to equitable tolling, then, Johnson must demonstrate that this was an extraordinary circumstance that prevented him from filing an application on time, despite his reasonable diligence. *Belot*, 490 F.3d at 205.[8]

A review of the dockets for Johnson's case before this Court and on his appeal before the Second Circuit confirms that he did send letters to both courts, as he claims. On or about April 14, 2009, while his appeal was pending, Johnson sent the Second Circuit a letter seeking reassignment of counsel, based on "irreconcilable differences" with his appointed counsel, Lawrence Gerzog. (*United States v. Johnson*, No. 08-5300-cr ("2d Cir. Dkt."), Dkt. entry dated Apr. 15, 2009.) Petitioner sent a second letter on or about October 29, 2009, roughly two weeks after briefing was completed on his direct appeal. This letter again requested that Attorney Gerzog be removed from the case for ineffectiveness. (2d Cir. Dkt., entry dated Oct. 29, 2009.) In particular, Johnson protested that he had never heard from counsel, and that he had no legal documents concerning his case and, thus, could not assist in preparing his appeal. (*Id.*) Petitioner, additionally, sent this Court a letter, filed on October 29, 2009, again asking to have Attorney Gerzog removed from his case and complaining that he could not reach his counsel at all. (*See* 2007 Dkt. No. 73.) Johnson also requested copies of his 3500 material and trial transcripts, which

---

[8] The period that Johnson seeks to toll is not clear from his petition, but the Court will assume that Johnson seeks to toll the period from its commencement until he received his legal materials on August 25, 2011.

he asserted had been sent to the district court by accident. (*Id.*) On or about March 3, 2010, Johnson sent the Court of Appeals a "Motion to Compel Counselor to Respond," in which he sought an order compelling Attorney Gerzog to respond to his allegedly unanswered letters. (2d Cir. Dkt. Entry dated Mar. 9, 2010.)

All of these letters were sent before June 14, 2010, when the § 2255 clock began to run. Johnson provides no evidence of communications or any other diligent pursuit during the one-year window for filing his petition, nor the affidavit from Gerzog that he forecasted in his petition. Nonetheless, despite the absence of corroborating evidence, the Court will assume that, as he claims, Johnson continued to seek access to his trial materials during the relevant window of time, and did not receive them until August 25, 2011.

Whether a circumstance is "extraordinary" for purposes of equitable tolling is determined by inquiring "not how unusual the circumstance alleged . . . is among the universe of prisoners, but rather how severe an obstacle it is for the prisoner endeavoring to comply with AEDPA's limitations period." *Diaz v. Kelly,* 515 F.3d 149, 154 (2d Cir. 2008). Crucially, "a delay in [a petitioner's] ability to get in contact with his attorney to request a copy of his trial transcripts and other documents, and the temporary withholding of those documents by the prison mail room . . . are far from extraordinary." *Rivera v. United States*, 448 F. App'x 145, 146 (2d Cir. 2011). In *Rivera*, the Second Circuit affirmed the district court's finding that a petition was untimely where, despite writing repeatedly to his attorney, the petitioner did not receive his transcripts and other documents that he

needed until about two weeks before his § 2255 motion was due. The appeals court found that there was no extraordinary circumstance, because the petitioner had "not alleged egregious conduct on the part of his attorney;" "was denied access to the requested documents only temporarily; the confiscation of his transcripts [by prison officials] was accidental; and at no point was he deprived of his actual habeas petition." *Id*; *cf. Valverde v. Stinson*, 224 F.3d 129, 133-34 (2d Cir. 2000). The Second Circuit also held that the petitioner had failed to exercise due diligence, because he "still had a couple of weeks to file before his § 2255 motion was due once he received the requested documents . . . . [and] this was enough time for [the petitioner] to have filed a timely, even if unpolished, petition." *Id.*

Like the petitioner in *Rivera*, Johnson does not allege intentional confiscation of his transcripts, nor of his actual habeas petition. At the same time, the circumstances Johnson alleges are, perhaps, more egregious than that in *Rivera*. Petitioner did not receive his transcripts until *after* his petition was due, and, as he alleges, and unlike in *Rivera*, he was never able to call his lawyer or otherwise get in touch with him directly. *Cf. Holland v. Florida*, 130 S.Ct. 2549, 2564 (2010) (An attorney's "'garden variety' or 'excusable neglect'" will not constitute an "extraordinary circumstance," but failure to "to communicate with [the] client[], to implement [the] clients' reasonable requests, to keep the[] client[] informed of key developments in [his] case[]," among other things, may suffice.) Yet, even this is leavened since, at the time relevant here, Lawrence Gerzog was petitioner's *former* attorney. With the direct appeal concluded, his representation has come to an end.

In any event, even if failure by Attorney Gerzog to provide Johnson with his trial materials does constitute an extraordinary circumstance, Johnson must show that it prevented him from timely filing a § 2255 application, *i.e.*, "a causal relationship between the extraordinary circumstances . . . and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances." *Valverde*, 224 F.3d at 134. "The standard is not 'extreme diligence' or 'exceptional diligence,' it is *reasonable* diligence. . . . [T]he district court should ask: did the petitioner act as diligently as reasonably could have been expected *under the circumstances?*" *Baldayaque v. United States*, 338 F.3d 145, 153 (2d Cir. 2003) (emphasis in original).

For example, the Second Circuit has held that an inmate whose petition was delayed as a result of a one-week prison lockdown that prevented him from accessing the law library during the week before his petition was due was not entitled to equitable tolling, because "the petitioner ought reasonably to have begun his preparation earlier and filed an unpolished—but timely—petition rather than wait[ ] to file his [more polished] petition until the week that the deadline expired." *Belot v. Burge*, 490 F.3d 201, 207-08 (2d Cir. 2007) (internal quotations omitted). Furthermore, where a petitioner was aware of his claims and could have made them all in a filing without reference to his legal papers, then the causal link is broken and equitable tolling is not appropriate. *See United States v. Rodriguez*, 438 F. Supp. 2d 449, 454-55 (S.D.N.Y. 2006).

Here, Johnson seeks § 2255 relief on five grounds which, repeated for context, are: (1) that a witness was improperly allowed to identify him in court; (2) that evidence of an uncharged shooting was improperly admitted against him; (3) that two of the witnesses that testified against him were not credible; (4) that the prosecutor in his case was "overzealous;" and (5) the virtually automatic claim that his trial counsel was ineffective. Acting with reasonable diligence, Johnson could have easily stated all of the claims in his petition, maybe in a less polished form, without access to the papers he claims here to have been denied. All of the allegations in the petition are based on events that occurred at trial, which were fully known to Johnson by the end of trial and could have been asserted in a timely petition. Indeed, the petition, as submitted, makes no references to any of the transcripts or other court documents, and, according to Johnson, was prepared anyway without access to any of the discovery he was provided by the prosecution. Consequently, it is clear that Johnson could have filed a timely unpolished petition or an application for habeas relief coupled with a request for an extension. *Belot*, 490 F.3d at 207-08. Simply put, reasonable diligence requires, minimally, that the petitioner was aware of the filing deadline, was seeking to meet that deadline, and to have made a filing with the habeas court requesting an extension of time or the filing of an unpolished petition before that deadline. The failure to do so makes Johnson's petition untimely. That absence of reasonable diligence is fatal, and the petition is dismissed on that ground.

## II.    Johnson's Petition

Had the statute of limitations not slammed the courthouse door closed on Johnson's habeas application, as the following discussion reveals, it would have entitled him to no remedy.

## A. In-Court Identification

Johnson first asserts that Paul Jamrogiewicz, the victim in the July 25, 2005 shooting, was improperly allowed to identify him in court as the driver of the red Hummer, given that he previously had been unable to identify him in a photo array at the time of the shooting.

As a preliminary matter, Johnson failed to raise this claim on his direct appeal. As such it is defaulted, meaning petitioner is barred from raising the claim on this § 2255 petition, "unless he can establish both cause for the procedural default and actual prejudice resulting therefrom or that he is 'actually innocent' of the crime of which he was convicted." *De Jesus v. United States*, 161 F.3d 99, 102 (2d Cir. 1998) (citations omitted). Johnson makes no showing that he is "actually innocent," meaning that he may be heard on this claim only if he can demonstrate cause for failing to raise the issue, and resulting prejudice.[9] Because Johnson did not suffer actual prejudice as a result of the allegedly improper in-court identification, the claim would fail.

_____

[9] In his response to the government's motion to dismiss on the merits, Johnson does assert, for the first time, that it is "clear," based on the evidence that was presented at trial, that he was framed – actually innocent. "To establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him.'" *Bousley v. United States*, 523 U.S. 614, 623 (1998). The evidence at trial was overwhelmingly to the contrary.

Petitioner appears to argue on the merits that the in-court identification was improper because it was "tantamount to a showup," *United States v. Matthews*, 20 F.3d 538, 547 (2d Cir. 1994), *i.e.*, the suggestive presentation to the victim of a single suspect. While the trial court has discretion to take steps to avoid any unfairness in an in-court identification, "[t]he court is not required . . . to take such steps *sua sponte*. It is incumbent upon the defendant to ask, for example, to be seated somewhere other than at the counsel table, or not to be present, or to be placed in a lineup prior to the in-court identification." *Id.* From the discovery made available by the government, petitioner was aware that Jamrogiewicz would be testifying and no application for any such measures were made, nor did his attorney object to the identification at the time.

Moreover, "[e]ven an identification at trial under circumstances that are tantamount to a showup is 'not per se inadmissible, but rather depend[s] upon the 'totality of the circumstances.'"" *Id.* (quoting *United States v. Archibald,* 734 F.2d 938, 942 (2d Cir. 1984). In this case, the circumstances suggest that counsel's silence was not the result of incompetence, but rather was sound strategy. As Johnson himself acknowledges, Jamrogiewicz's prior inability to identify him from a photo array "was brought up during cross examination and [Jamrogiewicz] admitted to . . . not being able to identify [him]." (2011 Dkt. No. 8 at 2.). At the very least, this cast substantial doubt on the credibility of the in-court identification, which was made two-and-a-half years after the fact. Indeed, even absent such a damning contradiction, the Second Circuit has stated with respect to in-court

identifications that "the apparent weakness of this kind of identification . . . saves it from condemnation as being itself impermissibly suggestive." *Archibald*, 734 F.2d at 942 (quoting *Brathwaite v. Manson*, 527 F.2d 363, 367 (2d Cir. 1975)); *see also Flowers v. Ercole*, No. 06-cv-6550, 2008 WL 2789771, at *11 (E.D.N.Y. June 23, 2008) (In-court identification can be admissible without pretrial proceeding, because "defense counsel has the opportunity at trial to cross-examine the witness and explore the weaknesses and suggestiveness of his in-court identification.") (quotation and alterations omitted). Conversely, having Johnson participate in a line-up, or removed from counsel table, would have risked bolstering Jamrogiewicz's identification, had Jamrogiewicz been able to correctly identify Johnson. The jury had the information about Jamrogiewicz's prior non-identification and was able to take it into account in weighing the value of the in-court identification. Given the "totality of the circumstances," the identification was properly admitted.

Additionally, the other evidence that Johnson committed the July 25, 2005 shooting (and thus possessed ammunition in connection with that shooting) was sufficient that even discounting the in-court identification completely, the jury could reasonably have convicted Johnson on count one. Evidence firmly established that Johnson owned the red Hummer involved. An eyewitness to the altercation testified that he saw the driver of the Hummer exit the vehicle and shoot Jamrogiewicz. A McDonald's employee testified that Dayshawn Mitchell—the individual on whom Johnson sought to pin the shooting—was a passenger in the Hummer, and not the

driver, when the Hummer passed through the drive-through immediately before the altercation occurred only a few blocks away. Additionally, ballistics evidence showed that the bullet recovered from the scene of the July 25 shooting was fired from the same gun as the bullet recovered from the scene of the December 9, 2005 shooting, strengthening Johnson's tie to the July shooting. Even more overwhelming evidence showed that Johnson had committed that shooting. The identification, even if improperly admitted, was not prejudicial on the totality of the evidence.

### B. Admission of "Other Acts" Evidence

Petitioner next challenges the Court's decision to admit evidence of the uncharged December 9, 2005 shooting. This issue was raised and fully considered on direct appeal. The Second Circuit affirmed, finding, in particular, that "[e]ven if the evidence was admitted in error, such error was harmless when assessed against the Government's overwhelming case," and that any delay in giving the jury a limiting instruction was caused by Johnson. *United States v. Johnson*, 365 F. App'x 242, 244 (2d Cir. 2010).

Because Johnson unsuccessfully raised this very argument in his direct appeal, he is procedurally barred from raising it in his § 2255 petition. *See United States v. Sanin*, 252 F.3d 79, 83 (2d Cir. 2001) ("It is well established that a § 2255 petition cannot be used to 'relitigate questions which were raised and considered on direct appeal.'") (quoting *Cabrera v. United States*, 972 F.2d 23, 25 (2d Cir. 1992); *see also Guastella v. United States*, 06-cv-2924, 2009 WL 1286382, at *8 (S.D.N.Y.

17

May 8, 2009) (". . . [o]nce the defendant's chance to appeal has been waived or exhausted . . . we are entitled to presume he stands fairly and finally convicted, especially when, as here, he already has had a fair opportunity to present his federal claims to a federal forum.") (quoting *United States v. Frady*, 456 U.S. 152, 164). Lastly, petitioner identifies no intervening change in the law that would provide a basis for reconsideration of this claim. It is dismissed.

### C. Witness Testimony

Johnson argues on this point that two of the witnesses who testified against him, Javon Jenkins and Kerry Constantino, were "not credible." He asserts that Jenkins was forced to testify against his will, and did so only after being threatened by the prosecutor. He further contends, on reply, that Jenkins was coerced by the AUSA into implicating him, and to "say things about [him] that he knew [were] not true." With regard to Constantino, Johnson argues that she has been arrested 31 times and has given authorities false names, and that she picked someone other than Johnson out of a lineup following the December 4 shooting, only changing her story to claim that Johnson was the shooter after meeting with an AUSA. Given that "[a] Section 2255 motion is not a vehicle for rearguing the credibility of witnesses," *Conteh v. United States*, 226 F. Supp. 2d 514, 519 (S.D.N.Y. 2002), the Court will treat this as a claim that these two witnesses perjured themselves in their trial testimony. Nonwithstanding, Johnson failed to raise this claim on appeal, must, as noted earlier, establish both cause for the procedural default and actual prejudice resulting therefrom in order to maintain it here. *De Jesus*, 161 F.3d at 102. Again,

he makes no such showing.

Substantively, to prevail on a claim of perjured testimony, "a petitioner must show: '(i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the alleged perjury at [the] time of trial, and (iv) the perjured testimony remained undisclosed during trial.'" *Guastella*, 2009 WL 1286382, at *11 (quoting *United States v. Zichettello*, 208 F.3d 72, 102 (2d Cir. 2000)). Reversal of a conviction on this ground should be granted "only with great caution and in the most extraordinary circumstances." *Zichettello*, 208 F.3d at 102.

Here, Johnson does not provide a single piece of testimony of either witness that he claims was perjured. Nor does he provide any basis on which to conclude that the government knew or should have known of any perjury. Additionally, even if the credibility issues that Johnson does point to now could form the basis of a perjury claim, they were all explored at trial before the jury: Jenkins specifically testified that he took the stand involuntarily only after being subpoenaed. (Tr. at 82.) Jenkins also acknowledged that he had been arrested for numerous prior crimes, including assault, possession of stolen property, and possession of a gun, which he had intended to use to shoot someone. (Tr. at 87-89.) Constantino acknowledged on both direct and cross-examination that, following the December 4 shooting, she picked out someone other than Johnson as the shooter from a photo array. (T 285, 292-93.) On cross-examination, Constantino also acknowledged that she had previously used two aliases with the police. (T 294.) Constantino was,

additionally, asked questions regarding the fact that she had robbed and stolen from people and had been arrested 31 times. But objections to those questions were sustained, and she was directed not to answer. (*Id.*)

Further, all testimony by both Jenkins and Constantino that was even arguably material was confirmed by other evidence. For example, Jenkins identified Johnson in a still photograph, taken from a surveillance video, as the person wearing the white-and-brown fur coat. But, Johnson had previously identified himself to police in that very photo, which was admitted against him. (Tr. 158 (Detective Nolan testified that, when she showed Johnson the image of the man in the fur coat, he asked "Hey, where'd you get my picture from?").) As for Constantino's testimony that she saw the man in the fur coat shoot Kaufman, Kaufman himself also testified that he was shot by the same man in the fur coat. This too was also confirmed by video surveillance footage. (Tr. 198-99.) On the totality of the evidence, the finding that Johnson committed the December 4 shooting was overwhelming. Indeed, Johnson confessed to committing the shooting. (Tr. 164.) Assuming there was perjury in the testimony, there is no question here. Petitioner has failed to demonstrate actual prejudice arising from it.

## D. "Overzealous Prosecution"

The next target is the prosecutor herself and the claim that she was "overzealous," which the Court will treat as one asserting vindictive prosecution. It is true that Johnson had a history with then Special Assistant U.S. Attorney Kathleen Naughton, the lead prosecutor in his case. When Johnson was 16,

Naughton, an Assistant District Attorney in Richmond County, prosecuted him in Staten Island state court on felony charges for which he was convicted and incarcerated. After petitioner was released, Naughton brought charges against him based on, essentially, the same facts as underlie the subject conviction, but the charges were eventually dropped—Johnson says due to lack of physical evidence and cooperation from eye witnesses. Naughton, shortly thereafter, was named a Special Assistant U.S. Attorney for purposes of prosecuting federal gun possession charges against Johnson. After completion of the Johnson case, Naughton returned to her position in Richmond County. The claim spotlighting Prosecutor Naughton was another of the claims he failed to raise at trial or on appeal, and he must satisfy the same threshold requirements as with the other procedurally defaulted claims. But, as analyzed below, like the others, the threshold is not crossed. The claim is meritless.

In order to prevail on a claim of vindictive prosecution, Johnson would have to make a showing of either "'actual' vindictiveness, or . . . a presumption of vindictiveness that has not been rebutted by objective evidence justifying the prosecutor's action." *United States v. Johnson*, 171 F.3d 139, 140 (2d Cir. 1999). Actual vindictiveness must be proved by "'direct' evidence, such as evidence of a statement by the prosecutor . . . ." *Id.* at 141 (citing *United States v. Goodwin*, 457 U.S. 368). "A presumption of vindictiveness arises when the circumstances of the case create a "realistic likelihood" of prosecutorial vindictiveness." *Id.* at 141. "The relevant question, therefore, is whether there is a 'realistic likelihood' that the

Government acted out of a vindictive motivation, rather than a legitimate one . . . ." *Id.* "To establish an actual vindictive motive . . . the defendant must show that '(1) the prosecutor harbored genuine animus toward the defendant . . . such that the prosecutor could be considered a 'stalking horse,' and (2) [the defendant] would not have been prosecuted except for the animus.'" *United States v. Sanders*, 211 F.3d 711, 716-17 (2d Cir. 2000) (quoting *United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1999)) (second alteration in original).

Petitioner sets forth no evidence of actual vindictiveness here. Nor do the circumstances in this case create a presumption of vindictiveness; rather, they clearly reveal a legitimate prosecutorial motivation. Johnson appears to claim that Kathleen Naughton prosecuted him out of a general personal animus toward him, which he infers solely from the fact that she had prosecuted him three times. But, the past prosecutions alone do not give rise to a presumption of vindictiveness. "[T]he decision as to whether to prosecute generally rests within the broad discretion of the prosecutor, . . . and a prosecutor's pretrial charging decision is presumed legitimate." *Sanders*, 211 F.3d at 716 (2d Cir. 2000) (quotation and citation omitted). Moreover, a presumption of prosecutorial vindictiveness does not arise merely because "a State brings another indictment supported by evidence against a defendant after an acquittal," because "the State is not levying punishment for a right exercised but rather for the crimes [the defendant] committed." *Johnson*, 171 F.3d at 141. Additionally, the federal government is free to prosecute a defendant if it is dissatisfied with the outcome of a state prosecution. *United States*

*v. Ng*, 699 F.2d 63, 68 (2d Cir. 1983). Ultimately, Johnson's claim boils down to a complaint that Attorney Naughton pursued him for crimes that he committed, in a manner that he perceives as "overzealous." This is not a ground for which habeas relief is available, even when the claim is not procedurally defaulted.

### E. Ineffective Assistance of Counsel

Finally, petitioner argues that his trial attorney was ineffective. Pursuant to the test put forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas petitioner claiming ineffective assistance of counsel must "(1) demonstrate that his counsel's performance fell below an objective standard of reasonableness in light of prevailing professional norms; and (2) affirmatively prove prejudice arising from counsel's allegedly deficient representation." *Carrion v. Smith*, 549 F.3d 583, 588 (2d Cir. 2008) (citations omitted). To establish subpar performance, a petitioner must overcome the "strong presumption that counsel's performance falls within the wide range of reasonable professional assistance." *Brown v. Greene*, 577 F.3d 107, 110 (2d Cir. 2009) (citations omitted). The presumption is overcome only if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. "[T]he proper standard for attorney performance is that of reasonably effective assistance." *Id.* Johnson never gets past this first prong of the test.

Petitioner bases his ineffective assistance claim on two grounds. First, he argues that his attorney did not have sufficient time to prepare for his case,

23

particularly given that Attorney Weiss did not receive the 3500 material from the prosecution until five days before trial, and did not receive other discovery until the morning of trial.[10] Second, he argues that his attorney's performance was deficient, in that he did not know the proper questions to ask the prosecution's witnesses, and, in cross-examining Jenkins, he "mix[ed] up incidents numerous times." (2011 Dkt. No. 8 at 4.) Johnson fails to point to any specific failures by his counsel he broadly charges took place, or any ways in which Attorney Weiss could have performed better with more preparation.

A review of the record shows that his counsel's performance well surpassed any objective standard of reasonableness. As a preliminary matter, it appears that it was at Johnson's election that trial moved forward only ten days after the appointment of new trial counsel, and that Attorney Weiss agreed that he could and would be ready on ten days' notice. (Tr. dated Feb. 4, 2008 at 2, 9.) More importantly, however, the record demonstrates that trial counsel mounted a vigorous and skilled defense. Within days of being appointed, trial counsel filed several motions, and he prevailed on more than one discovery dispute. (*See* Tr. at 75-75, 105, 124-25, 142.) He competently impeached the prosecution's witnesses using their grand jury testimony and criminal history. (*See, e.g.,* Tr. 220-21.) The complaints that Johnson makes are immaterial in any case. For example, Attorney

---

[10] Although the statute does not compel production of this material to the defense "until [each] witness has testified on direct examination in the trial of the case", 18 U.S.C. § 3500(a), the Court notes that the custom in this district is to turn it over, in its entirety, approximately four days before trial commences. That custom, effectively, was followed here.

Weiss did mispeak while cross-examining Jenkins as to whether the December 4 shooting took place in the Arlington or Stapleton area of Staten Island. He also mistakenly asserted in his opening that Trai Kaufman, the victim in the December 4 shooting, was dating Dashawn Mitchell's sister, apparently in an attempt to create a motive for Mitchell to have shot Kaufman. Supporting evidence, however, proved lacking. (*See* Tr. 308.) That counsel grasped at this straw and came up empty was entirely inconsequential – the overwhelming evidence gave him little else to say. Indeed, none of these claimed errors were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. And, even if they were, it cannot be said that, but for these errors, "the result of the proceeding would have been different." *Id.* at 688. Consequently, Johnson's ineffective assistance claim is baseless. It too is dismissed.

## Conclusion

For the foregoing reasons, the petition for habeas corpus filed by Pearlie Johnson, pursuant to § 2255, is dismissed and the writ is denied.

Additionally, as petitioner makes no substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-5 (1962).

The Clerk of Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      August 29, 2014

                                          s/Eric N. Vitaliano

                                          **ERIC N. VITALIANO**
                                          **United States District Judge**